Madden, Judge,
delivered the opinion of the court:
The plaintiffs, husband and wife, live in California. The income involved in this suit for the refund of taxes was community income. On or before March 15,1950, they filed their Federal income tax return for the year 1949. It showed gross income as follows:
Salary from M & S Theater Corporation_$10,400. 00
Expense allowance from M & S Theater Corporation_ 2, 600. 00
Half of capital gains amounting to $28,988.02_ 14,494.01
Total-$27,494. 01
The return showed deductions of $25,6.38.58 leaving an adjusted gross income of $1,855.33, and no tax due.
On April 22, 1954, which was more than three years but less than five years after the filing of the return, the Director of Internal Revenue at Los Angeles increased the plaintiffs’ gross income for 1949 by $14,494.01 and assessed a tax of $1,459.48, plus interest of $351.71. The plaintiffs paid these amounts, filed a timely claim for refund, and brought this suit.
The ground for the additional assessment was that the “Half of capital gains amounting to $28,988.02_ 14,494.01” shown on the return, should not have been reported as a capital gain item, but rather as a profit made in the ordinary course of trade or business and therefore fully taxable.
The plaintiff points to section 275 (a) of the Internal Revenue Code of 1939,26 U. S. C. (1952 Ed.), sec. 275, which says:
(a) General Rule — The amount of income taxes imposed by this chapter shall be assessed within three years after the return was filed, and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of such period.
*285 The defendant, on the other hand, relies on section 275 (c) which says:
(c) Omission from Gross Income — If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return, the tax may be assessed * * * at any time within 5 years after the return was filed.
The decisions indicate that when the Government invokes the exception of section 275 (c) to the basic three-year period of the statute of limitations, it has the burden of proving all the prerequisites to the application of the exception. Landau v. Commissioner, 21 T. C. 414. See also Jacobs v. United States, 131 C. Cls. 1. The courts have, we think rightly, refused to give the Government the benefit of the exception if in fact the income in question is shown on the return, though it is omitted in arriving at the amount shown on the return as gross income. Slaff v. Commissioner, 220 F. 2d 65, C. C. A. 9, reversing id. 12 T. C. M. 644; Deakman-Wells Co. v. Commissioner, 213 F. 2d 894, C. C. A. 3; Uptegrove Lumber Co. v. Commissioner, 204 F. 2d 570, C. C. A. 3; Davis v. Hightower [C. C. H. 56-1 USTC par. 9313, C. C. A. 5]; Hommes v. Riddell [C. C. H. 56-1 USTC par. 9385].
The plaintiffs could not have made any plainer disclosure of their gains of $28,988.02 than they did make, without putting them directly in the income column and paying taxes on them. It is not necessary for us to decide, and we do not decide the merits of the plaintiffs’ claim for capital gains treatment, but our findings show that it was at least arguable that the gains were capital gains. There being no concealment, and the Director having had full opportunity to take exception to the return within the normal statutory period, he was without authority to assess the tax in question after that period had expired.
Section 3770 (a) (2) of the Internal Eevenue Code of 1939,26 U. S. C. (1952 Ed.), sec. 3770, says:
Any tax (or any interest, penalty, additional amount, or addition to such tax) assessed or paid after the expiration of the period of limitation properly applicable thereto shall be considered an overpayment and shall be *286 credited or refunded to the taxpayer if claim therefor is filed within the period of limitation for filing such claim.
Much time and expense would have been saved if this case had been subjected to our motion procedure.
The plaintiffs are entitled to recover $1,811.19, with interest as provided by law.
It is so ordered.
LaRamoke, Judge; Whitaker, Judge; Littleton, Judge; and Jones, Ohief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Mastin Gr. White, and the briefs and argument of counsel, makes findings of fact as follows:
1. This is a suit to recover the sum of $1,811.19 (plus interest) that was paid by the plaintiffs to the defendant when the defendant in 1951 made an assessment against the plaintiffs in the amount of $1,459.48 as additional income tax allegedly due for the year 1949, together with interest in the amount of $351.71 on such additional tax. The assessment was made pursuant to determinations by personnel of the defendant’s Internal Revenue Service: (a) that net profits which the plaintiffs reported in connection with their 1949 income tax return as totaling $28,988.02, and as having been derived from the sale of 25 lots in a subdivision of the City of Los Angeles known as Tract 14471, constituted ordinary income and not long-term capital gains, as contended by the plaintiffs; and (b) that a loss of $1,000.00 on worthless stock which the plaintiffs reported in connection with their 1949 income tax return constituted a long-term capital loss rather than a short-term loss, as contended by the plaintiffs.
2. The plaintiffs now concede that the determination made by the Internal, Revenue Service respecting the loss on worthless stock, referred to in finding 1, was correct.
3. The plaintiffs are husband and wife. They reside in California.
4. All the income involved in this case was community income. Plaintiff Simon M. Lazarus actively managed the Qommunity enterprises at all times pertinent to this case; *287 and whenever the term “plaintiff” is used hereinafter in the singular, it refers to plaintiff Simon M. Lazarus.
5. The plaintiff had been continuously engaged in the business of operating motion picture theaters from 1917 until the date of the trial in this case. At times, the theaters operated by him were individually owned by the plaintiff, and at other times they were owned by a corporation, which was, in turn, owned by the plaintiff. During the period between 1937 and 1947, the plaintiff was engaged in a joint operation of four theaters with Fox West Coast, the latter owning a 51 percent interest in the four theaters and the plaintiff owning the remaining interest. During that period, personnel of Fox West Coast did most of the work in connection with the operation of the four theaters, it only being necessary for the plaintiff to go to the office once or twice a week in order to sign checks and make out bookings. In 1947, following the divorcement of motion picture production from exhibition as a result of action by the Federal Government, the joint operation of theaters by the plaintiff and Fox West Coast was terminated. In the dissolution of the association, Fox West Coast took over two of the four theaters and the plaintiff took over the other two theaters, the ownership of which was vested in a corporation wholly owned by the plaintiff, namely, the M & S Theater Corporation. Thereafter, it was necessary for the plaintiff actively to manage the theaters that he retained upon the termination of his association with Fox West Coast; and, as a result, the greater part of each working day was devoted by the plaintiff to the theater business. However, during the period from 1947 through November 1949, the plaintiff did not go to his theater office on week ends, and he customarily left the office on work-day afternoons in time to get home by 3:00 p. m.
6. On December 31, 1943, the plaintiff acquired by purchase an undivided one-half interest in certain acreage within the portion of the City of Los Angeles, California, known as Tarzana. . The co-purchaser was one Regina Hill, who similarly acquired an undivided one-half interest in the land. The purchase involved a total of more than 500 acres; but almost immediately thereafter, the Board of Education *288 bought approximately 400 acres of the land. On February 8, 1944, the portion of the acreage retained by the plaintiff and Kegina Hill was partitioned between them, each thereby acquiring the sole ownership of half of the property partitioned. The plaintiff’s half consisted of approximately 73 acres; and the purchase price paid by the plaintiff for this parcel amounted, in effect, to $10,043.32.
7. Shortly after the partition of the property referred to in finding 6, the plaintiff acquired two other pieces of land that were contiguous to the 73-acre parcel obtained by the plaintiff as a result of the partition. One of these, consisting of approximately one and one-half acres, was acquired at a cost of $7,500.00 for the purpose of eliminating a jog in the property line of the 73-acre parcel. The other, which also consisted of approximately one and one-half acres, was acquired at a cost of $1,100.00 for the purpose of improving access to the 73-acre parcel. With these two additional pieces of land, the property acquired by the plaintiff represented a total of approximately 76 acres. The property was bounded on the west by Winnetka Street and on the south by Ventura Boulevard.
8. The total purchase price paid by the plaintiff for the 76 acres amounted to $18,643.32. This total was made up of: (a) $10,043.32 representing the purchase price of the 73-acre parcel initially acquired; (b) $7,500.00 representing the purchase price of one of the small parcels subsequently acquired.; and (c) $1,100.00 representing the purchase price of the other small parcel subsequently acquired by the plaintiff.
9. When the plaintiff acquired the 76 acres, he intended to use the land for a farm. He built a wire fence around the property, purchased some calves, and put them on the land. However, the cattle-raising venture was a failure, and it was discontinued not later than the early part of 1945. Corn was planted on the property one year, in 1944 or 1945, and it may have been planted a second year. There were bearing walnut trees on 14 or 15 acres of the land, and nuts were harvested from these trees in commercial quantities for two or three years after the acquisition of the land by the plaintiff. One year, the proceeds from the walnut crop amounted to several thousand dollars. The plaintiff cut down and *289 removed a line of spruce trees, 180 to 200 in number, with, the expectation of planting an additional walnut grove on the cleared area, but the additional walnut trees were never planted. Leveling was done on a 12-acre area in the northeastern portion of the property for a commercial orange grove; a chain-link fence was built around this area; and from 500 to 1,000 young orange trees were planted there, beginning in 1945. A stable and related farm buildings, designed primarily to house equipment and supplies, were built. Farm machinery and equipment, including a jeep, were purchased.
10. The plaintiff had the full-time services of a man on the farm from about the time of its establishment until sometime in 1948. Thereafter, for the remainder of 1948 and for eight or nine months in 1949, the plaintiff had the part-time help of a boy who would come from a nearby college and help on the farm whenever assistance was necessary. The boy usually worked on the farm several days in each week, and for several hours per day. The plaintiff himself did very little work on the farm prior to 1947; but from 1947 through November 1949, he worked on the farm during week ends and after 3:00 o’clock on other afternoons.
11. Soon after the end of World War II, the plaintiff built a little, square, one-story, two-unit dwelling house on the farm. The house was situated at one end of the 12-acre fenced-in area that included the young orange grove. Each unit of the dwelling house consisted of three small rooms. One unit was intended for the farm hand, and it was occupied by him and his wife until the full-time farm hand left sometime in 1948. After the full-time farm hand left, no laborer lived on the farm. The other unit was intended for the plaintiff and his wife, and they occupied it until the end of November 1949.
12. Early in 1946, the plaintiff decided to build a drive-in motion picture theater on his land. On March 25, 1946, he filed plans for the drive-in theater with the Los Angeles Building and Safety Department. It was to be a single-screen theater, and was to be located on the portion of the property near Ventura Boulevard. On April 24,1946, a permit to build a foundation for the drive-in theater was issued *290 by the City of Los Angeles. On May 2, 1946, the plaintiff made application to the Civilian Production Administration of the United States for permission to build the theater, such permission being required under that agency’s C. P. A. Order No. 1. This application was denied on May 18,1946.
13. On June 1, 1946, the zoning regulations of the City of Los Angeles were changed so as to eliminate the area in which the plaintiff’s land was located from the zones in which theaters could be built. However, on July 18, 1946, the plaintiff was granted a 90-day extension of the permit to build a foundation for a theater on his land; and on August 5, 1946, a ruling was issued by the Zoning Administrator of the City of Los Angeles that the permit was still valid and would continue to be effective until the expiration of a 30-day period following the rescission of the Federal regulations prohibiting such construction (C. P. A. Order No. 1).
14. Shortly after the events referred to in finding 13, the plaintiff decided to sell part of his land. It was then his intention that the proceeds would be used principally to help finance the drive-in theater mentioned in findings 12 and 13. On September 3,1946, he entered into a contract with Willard T. Nelson whereby the latter was to do the engineering work necessary in subdividing a portion of the 73-acre parcel initially acquired (see finding 6) into a subdivision for sale. On the same date, the City of Los Angeles assigned the designation Tract 14471 to the proposed subdivision. On September 4, 1946, a tentative plat of Tract 14471 was submitted to the proper authorities of the City of Los Angeles. This tract consisted of 24 acres in the eastern part of the 73-acre parcel. It contained the walnut trees mentioned in finding 9, and was regarded by the plaintiff as the most saleable part of the property. It was divided by the tentative plat into 32 lots.
15. On September 26, 1946, the City Engineer of the City of Los Angeles advised the City Planning Commission of his approval of the tentative plat for Tract 14471, subject to the making by the plaintiff of certain improvements on the property, including the installation of water mains, fire hydrants, public utility service connections, and drainage facilities, and the paving of certain streets and walks, all to *291 the satisfaction of the City Engineer. These improvements were required pursuant to an ordinance of the City of Los Angeles.
16. On October 8,1946, the City Planning Commission approved the tentative map of Tract 14471, subject to the City Engineer’s stated requirements as to improvements. On October 30, 1946, a final map, which incorporated the City Engineer’s stated conditions, was filed with the City Engineer, and on January 21, 1947, it was given final approval by him. On March 20, 1947, the plaintiff signed a promissory note for $40,000.00 in order to obtain a loan from the Pacific Mutual Life Insurance Company for the purpose of financing the required improvements on Tract 14471.
17. Opposition developed to a drive-in theater being constructed on the portion of the plaintiff’s property near Ven-tura Boulevard, and the plaintiff revised his plans for the theater so as to change the proposed site to a location some 300 or 400 feet away from Ventura Boulevard. The plaintiff also changed his plans by substituting a proposed two-screen theater for the single-screen theater originally contemplated, thereby increasing the area of land that would be required for the drive-in theater.
18. The developments referred to in finding 17 made any further action looking toward the disposition of Tract 14471 seem infeasible, since the area that had been platted as Tract 14471 would be needed for the two-screen theater at the new location provided for in the revised plans respecting the drive-in theater.
19. On August 15,1947, the plaintiff made a contract with certain architects whereby the latter were to prepare plans for the construction of the two-screen drive-in theater referred to in finding 17. He thereafter applied on October 2, 1947, to the Zoning Administrator of the City of Los Angeles for a variance from the zoning regulations (see finding 13) so that he could use a portion of his land for a drive-in theater. An order granting the variance was issued on January 26,1948, the variance being subject to certain conditions that had to be complied with in the construction of the theater. On April 1, 1948, C. P. A. Order No. 1, which had theretofore prevented non-residential construction, was re *292 scinded; and on April 22, 1948, a revised permit was issued by the City of Los Angeles for the construction of the two-screen drive-in theater on the plaintiff’s property. On April 30,1948, bids for the construction of the theater were opened by the architects, and the estimated cost of the construction alone was shown to be $138,000.00. On the same date, the plaintiff decided to, and did, abandon the drive-in theater project.
20. The plaintiff’s reasons for abandoning the drive-in theater project were two-fold. The main reason was that on the very day when the bids were opened, the plaintiff learned that construction was being started on another drive-in theater located only about one and one-half or two miles from the site of his proposed theater. A second reason was that he regarded the cost as prohibitive. The architects in August 1947 had estimated the cost of the plaintiff’s proposed theater, including fixtures, at about $100,000.00; but when the bids were opened on April 30,1948, it appeared that the cost of the theater, including fixtures, would be about $175,000.00.
21. Following the abandonment of the drive-in theater project, the plaintiff once more began to take steps looking toward the establishment of Tract 14471 as a subdivision for sale. On June 25, 1948, he submitted to the proper city authorities a request for a one-year extension of the time within which to file a final map of Tract 14471. This request was granted on July 22,1948. On October 29,1948, the subdivision was approved by the City Council, and the final map was recorded on the same date. Thereafter, the plaintiff entered into contractual arrangements whereby the improvements on the subdivision required by the City Engineer pursuant to an ordinance of the City of Los Angeles (see finding 15) were made. The plaintiff did not make any other improvements on the subdivision. The cost of the required improvements was paid, to the extent of $38,639.81, by the Pacific Mutual Life Insurance Company out of a loan fund credited by it to the plaintiff for that purpose; and the company was later repaid out of the proceeds derived from the sale of lots in Tract 14471. In addition, a total of $2,391.20 was paid out on these improvements by the plaintiff. The *293 total cost of the improvements on Tract 14471 thus amounted to $41,031.01.
22. After Tract 14471 had been established as a completed subdivision, with the 32 lots recorded and ready to deliver, the plaintiff offered to sell the subdivision as a single parcel to two different people, but neither was interested in purchasing the property at the price fixed by the plaintiff.
23. The plaintiff sold the lots in Tract 14471 through an independent real estate broker named John Bohannon, who handled any kind of real estate. The initial approach between the parties was from Bohannon to the plaintiff. Bo-hannon was looking for listings of property for sale. When Bohannon took on the assignment for the sale of the plaintiff’s property, he was sharing an office with another real estate broker, whose name was Harder and who operated under the name of the Harder Eealty Company. The office was located about four blocks from the plaintiff’s property, and Bohannon continued to occupy that office while engaged in the sale of the plaintiff’s lots. At one time, Bohannon and the plaintiff discussed the matter of Bohannon’s establishing an office on the plaintiff’s property, but Bohannon decided not to do so because he could not afford to maintain two offices and he feared that if he gave up his existing location the space would be taken over by a competing broker. Bohannon’s office rent and all his other office expenses were paid by Bohannon.
24. Bohannon was also handling the sale of other properties and, after taking on the assignment for the sale of the plaintiff’s property, he continued to sell the other properties as well as the plaintiff’s lots. Bohannon employed salesmen, and they worked on all the properties that Bohannon handled, including the plaintiff’s property. In no instance was a salesman specifically required to restrict his efforts to any one piece of property.
25. Twenty-five lots in Tract 14471 were sold during 1949 for a total of $74,350.00. All sales of the plaintiff’s lots were handled by Bohannon and the persons selected by him. The form of the sales contract that was used in selling the plaintiff’s lots was prepared by Bohannon. It was the same form that was used by Bohannon in the sale of other properties, *294 except for the name of the seller. The plaintiff did not participate in the sales activities, except to approve the prices that were fixed for the lots and to sign the sales contracts and the deeds to the lots as they were sold. When there was a document to be signed, Bohannon took it to the plaintiff or left it for him to sign at the bank where the sales were escrowed.
26. The plaintiff allowed Bohannon a commission of 8 percent on each sale. This commission was not excessive in relation to the customary business practice in the community. The total of Bohannon’s commissions for the sale of the plaintiff’s lots in 1949 amounted to $2,518.00.
27. In addition to using his salesmen for the sale of the plaintiff’s lots, Bohannon listed the plaintiff’s property with other brokers. If another broker sold a lot, he received 4 percent of the sale price. This came out of Bohannon’s commission of 8 percent. Bohannon’s salesmen were paid on the same basis.
28. Bohannon paid the sales expenses out of the 8 percent commission that he received from the plaintiff, except that the plaintiff, in effect, paid the bank and escrow charges and the title company’s charges for the conveyances. The total of these charges in 1949 amounted to $169.48. The bank collected such charges out of the escrow account on each sale, and remitted the balance to the plaintiff. That was done in accordance with the custom in the community whereby the seller of realty paid such charges in the absence of an agreement to the contrary, and this was true whether he sold lots in a subdivision or sold a single property, such as his home.
29. The plaintiff did not employ any salesmen to sell lots, he did not tell Bohannon whom to hire as salesmen, and he did not give any directions to, or have any discussions with, Bohannon’s salesmen. The plaintiff did not attempt to tell Bohannon what methods to use in selling the lots. He did not have any office for the sale of the lots, he never met a single purchaser of a lot, and he never engaged in any sales activities of any kind. The plaintiff did not keep any records relating to the sale of lots in Tract 14471, and he did not know which lots had been sold and which had not been sold.
*295 30. Bohannon in some instances, without first securing the plaintiff’s approval, raised the prices that had been originally fixed for lots in Tract 14471. He did not have any authority, however, to lower prices without first securing the plaintiff’s approval. Bohannon told the plaintiff everything that he was doing in connection with the sale of the plaintiff’s lots, and he was bound by the plaintiff’s wishes and instructions in all respects.
31. Bohannon spent from $700.00 to $1,200.00 per year for advertising on all the properties that he handled. His newspaper ads were usually general ads, applicable to any of the properties that he was handling, and did not relate to the plaintiff’s property alone. Even when an advertisement related to a particular property, the customers whom it attracted might be sold other property instead. Bohannon prepared and paid for all the advertising. The plaintiff did not prepare or pay for any of it.
32. Bohannon did not place any large sign on Tract 14471. He used only small “For Sale” and “Sold” signs there. These signs, which cost from $2.00 to $3.00 each, could be used on any property, and were not applicable merely to the plaintiff’s lots. They were moved by Bohannon from one property to another. The only names on the signs were those of Bohannon and the Harder Kealty Company. The plaintiff’s name did not appear on any of the signs.
33. The plaintiff did not lend any money to Bohannon in connection with the disposition of lots in Tract 14471.
34. The proceeds derived by the plaintiff from the sale of lots in Tract 14471 were used by the plaintiff in part to pay off his debts, in part to pay some personal expenses, and in part for expenditures in connection with his theaters, including the use of a large amount to remodel one of the theaters. None of the proceeds was ever used to buy real property for resale.
35. On November 30, 1949, the plaintiff sold the house referred to in finding 11. The sale contract, which provided for the payment of $23,500.00 to the plaintiff, not only included the house itself and a 1%-acre parcel of the orange grove where the house was situated, but it also included the *296 stable and enough of the chain-link fence that had been built around the orange grove (see finding 9) to enclose the one and one-half acres. The stable was not situated on the 1%-acre parcel at the time of the sale, but it was later moved there by the purchaser. The plaintiff turned over the farm machinery and equipment, with the exception of the jeep, to the purchaser of the property mentioned in this finding.
38. Although the contract for the sale of the l^-acre parcel of land and the other property referred to in finding 35 provided that the plaintiff would have an easement to enter through the buyer’s gate and traverse the 1%-acre parcel in order to have access to the portion of the orange grove retained by the plaintiff, so that the orange trees could be irrigated, no further farming operations were conducted by the plaintiff after November 30,1949 in connection with the orange grove or any other portion of the land referred to in findings 6 and 7 that was still retained by the plaintiff. No further use was made by the plaintiff of the portion of the chain-link fence around the orange grove that he retained after selling part of the fence to the purchaser of the 114-acre parcel, and the retained portion of the fence was sold after 1949 for $175.00 or $200.00 when the remainder of the 12-acre orange grove was subdivided into lots for sale (see finding 40). The plaintiff did not claim any depreciation on farm equipment, and he did not deduct any farm expenses, in preparing his 1950 income tax return.
37. (a) On or before March 15, 1950, the plaintiffs filed a joint income tax return for 1949 that showed no net income and no taxes due. The return, which was prepared on a cash basis, showed the plaintiffs’ gross income as follows:
Salary from M & S Theater Corporation__$10,400.00
Expense allowance from M & S Theater Corporation_ 2,600.00
Half of capital gains amounting to $28,988.02- 14, 494.01
Total_$27,494. 01
(b) In computing the capital gains of $28,988.02 referred to in finding 37 (a), the plaintiffs began with a figure of $54,629.77 purporting to represent the cost of the 24 acres of land, or 32 lots, comprising Tract 14471. (The purchase price of the land comprising Tract 14471 was $3,301.91— *297 24/73rds of $10,043.82 (see finding 6) — and a total of $41,-031.01 was spent on improvements in preparing the subdivision for sale (see finding 21), but the amounts of other costs are not established by the evidence in this case.) The figure of $54,629.77 was divided by 32 in order to get the cost per lot — $1,707.18—and this was multiplied by 25 in order to arrive at the total cost of the 25 lots that were sold in 1949 (see finding 25) — $42,679.50. The figure of $42,679.50 was deducted from $74,350.00 representing the proceeds from the sale of the 25 lots (see finding 25), leaving a remainder of $31,670.50. The sale expenses defrayed by the plaintiffs, amounting to a total of $2,682.48 (see findings 26 and 28), were then deducted from $31,670.50, leaving $28,988.02 as the plaintiffs’ figure for the total amount of the profits derived from the sale of the 25 lots in Tract 14471 during 1949.
38. (a) The plaintiffs, in arriving at their adjusted gross income on the 1949 income tax return, took the following deductions from their gross income figure of $27,494.01 (see finding 37 (a)):
Farm expenses_$3,676.77
Loss on sale of farm assets and land- 6,865.68
Loss on drive-in theater project abandoned_ 11,496.23
Loss due to worthlessness of stock_ 1,000.00
Other business expenses_ 2,600.00
Total_$25,638.68
The plaintiffs’ calculations showed an adjusted gross income of $1,855.33.
(b) (1) The plaintiffs’ figure of $3,676.77 for farm expenses included an item of $1,773.60 for farm labor, which item consisted of $693.60 paid out as wages to the part-time farm laborer (see finding 10) and $1,080.00 purportedly covering the furnishing of room and board to a farm laborer for 36 weeks. There was no laborer living on the farm in 1949 to be the recipient of room and board from the plaintiffs (see finding 11).
(2) The plaintiffs’ figure of $3,676.77 for farm expenses also included an item of $935.29 for depreciation, which item consisted of: $308.03 for the depreciation of farm machinery and equipment purchased in 1946 at a purported cost of *298 $4,106.79 (the expenditure of this amount is not established by the evidence in the case) ; $51.33 for the depreciation of farm machinery and equipment purchased in 1947 at a cost of $684.49; $304.26 for the depreciation of the chain-link fence enclosing the orange grove, which fence purportedly cost $4,056.65 (the expenditure of this amount is not established by the evidence in the case); $82.69 for the depreciation of orange trees that purportedly cost $3,307.80 in 1946 (the expenditure of this amount is not established by the evidence in the case); $12.34 for the depreciation of orange trees that cost $493.72 in 1947; $1.03 for the depreciation of orange trees that cost $123.44 in 1948; and $175.61 for the depreciation of the stable and related farm buildings, which cost $5,853.87.
(3) The remainder of the plaintiffs’ figure of $3,676.77 for farm expenses was made up of $330.16 for taxes, of $175.86 for gas and oil, of $154.58 for repairs and maintenance, of $123.57 for water, and of $183.71 for other expenses.
(c) The plaintiffs’ figure of $6,865.68 for the loss on the sale of farm assets and land was based upon the sale of the one and one-half acres of land, the stable, and the segment of chain-link fence mentioned in finding 35. It was not based to any extent upon the sale of the house mentioned in finding 35. In arriving at the figure of $6,865.68 as the amount of the loss on the sale of the one and one-half acres of land, the stable, and the segment of chain-link fence, the plaintiffs began by adding the following figures: $4,106.79 as purportedly having been spent on farm machinery and equipment, including the jeep, in 1946 (the expenditure of this amount is not established by the evidence in the case, and the jeep was not disposed of by the plaintiffs in 1949); $684.49 spent on farm machinery and equipment in 1947; $4,056.65 as purportedly having been spent on the chain-link fence enclosing the 12-acre orange grove (the expenditure of this amount on the fence is not established by the evidence in the case, and only enough of the chain-link fence to enclose one and one-half acres was disposed of in 1949) ; $3,307.80 as purportedly having been spent in 1946 on orange trees for the 12-acre orange grove (the expenditure of this amount is not *299 established by the evidence in the case, and only a 1%-acre parcel of the orange grove was disposed of in 1949); $493.72 spent in 1947 on orange trees for the 12-acre orange grove; $123.44 spent in 1948 on orange trees for the 12-acre orange grove; and $5,853.87 spent on the stable and related farm buildings. The total of these amounts was $18,626.76. To $18,626.76 was added the amount of $431.27 as purportedly representing the cost of the parcel of land that was sold (the correctness of this figure is not established by the evidence in the case), and the total of the two figures was $19,058.03. From $19,058.03 there was deducted the amount of $4,357.35 as representing depreciation previously allowed with respect to the property acquired at a purported total cost of $18,-626.76, and the remainder was $14,700.68. Then, out of the sale price of $23,500.00 covering the house, the one and one-half acres of land, the stable, and the segment of chain-link fence, the plaintiffs allocated $7,835.00 as the sale price of the property other than the house, which allocated sum was subtracted from the figure of $14,700.68, thereby showing a loss of $6,865.68 on the sale of the one and one-half acres of land, the stable, and the segment of chain-link fence.
(d) With regard to the plaintiffs’ figure of $11,496.23 for the loss on the drive-in theater project that was abandoned in 1948, the sum of $7,000.00 was paid to the architects who worked on that project, but the amounts of other costs incurred in connection with the project are not established by the evidence in the case.
(e) With regard to the plaintiffs’ figure of $1,000.00 for the loss on worthless stock, the plaintiffs now concede that such loss was a long-term capital loss rather than a short-term loss; and, accordingly, that only 50 percent of the loss, or $500.00, should have been used by the plaintiffs as a deduction in arriving at their adjusted gross income for 1949.
(f) The plaintiffs’ figure of $2,600.00 for other business expenses covered only the portion of plaintiff Simon M. Lazarus’ actual business expenses for which he was reimbursed by means of the expense allowance in the amount of $2,600.00 from the M & S Theater Corporation (see finding 37 (a)).
*300 39.The plaintiffs took the following deductions from their adjusted gross income figure of $1,855.33 (see finding 38 (a)) in arriving at their net income on the 1949 income tax return:
Contributions_ $100.00
Medical expenses_ 2, 500. 00
Taxes_ 1,475.63
Interest paid--- 1,224.44
Business expenses in excess of expense allowance (see finding 38 (f))_ 2,257.12
Total_$7, 557.19
The plaintiffs’ calculations showed that they did not have any net income in 1949. Exemptions in the total amount of $1,200.00 were claimed by the plaintiffs.
40. Proceedings looking toward the establishment of another subdivision for sale were completed by the plaintiff on March FT, 1950. That subdivision was designated as Tract 15746. It consisted of approximately 47y2 acres and was subdivided into 80 lots. Tract 15746 was made up largely of land out of the 73-acre parcel referred to in finding 6, but it also included at least one of the l^-acre parcels referred to in finding 7. The portion of the orange grove retained by the plaintiff after the sale of the 1%-acre parcel mentioned in finding 35 was subdivided as part of Tract 15746.
41. John Bohannon handled the sale of the lots in Tract 15746 for the plaintiff under arrangements similar to those that had been made between the plaintiff and Bohannon with respect to the sale of lots in Tract 14471. In 1950, 12 lots in Tract 15746 and 7 lots in Tract 14471 were sold. In 1951, 22 lots in Tract 15746 were sold. In 1952, 24 lots in Tract 15746 were sold.
42. The plaintiffs’ income tax return for 1950 showed gains of $33,600.00 from the sale of lots in Tracts 15746 and 14471. Their income tax returns for 1951 and 1952 showed gains of $52,000.00 and $32,674.00, respectively, from the sale of lots in Tract 15746.
43. The plaintiff never bought real estate for the purpose of resale. He never had a real estate license as broker, *301 dealer, or salesman. His only purchases of real estate, other than those mentioned in findings 6 and 7, were of homes for himself and family. He sold a home in the early 1930’s, another in 1946 or 1947, and another in 1949 (see finding 35). Subsequently, he bought a lot for the purpose of building another home for himself, but after the excavating was started, he had the plans changed and completed the house for sale.
44. (a) Pursuant to an examination made by an Internal Revenue Agent, the Director of Internal Revenue, Internal Revenue Service, United States Treasury Department, at Los Angeles, California, determined in 1954 that the lots in Tract 14471 were not capital assets, and, accordingly, that gains from the sale of such lots, shown by the plaintiffs as totaling $28,988.02 in 1949, were not capital gains but ordinary income. The Director thereupon increased the plaintiffs’ figure for gross income in 1949 to the extent of $14,494.01 in connection with this item.
(b) The Director of Internal Revenue also determined in 1954 that the plaintiffs’ loss of $1,000.00 in 1949 on worthless stock was not a short-term loss but a long-term capital loss. Accordingly, the Director increased the plaintiffs’ figure for gross income in 1949 to the extent of $500.00 in connection with this item. The plaintiffs concede that this adjustment was properly made.
(c) Except for the adjustments referred to in findings 44 (a) and 44 (b), neither the Director of Internal Revenue at Los Angeles nor any other agent of the defendant made any adjustment in the plaintiffs’ figures on their 1949 income tax return.
(d) Based on the increases made by the Director of Internal Revenue in the plaintiffs’ figures for gross income in 1949, the defendant on April 22, 1954, assessed against the plaintiffs the sum of $1,459.48 as additional income tax due for the year 1949, plus $351.71 as interest thereon, or a total of $1,811.19. The plaintiffs paid the amount of $1,811.19 to the Director of Internal Revenue at Los Angeles, California, on May 13,1954.
*302 45. (a) On May 21, 1954, the plaintiffs filed with the Commissioner of Internal Revenue, at the office of the Director of Internal Revenue in Los Angeles, a claim for the refund of the $1,811.19 referred to in finding 44 (d). The plaintiffs stated their grounds as follows:
The basis of the said deficiency assessment was a change from long-term capital gain to ordinary income of certain income derived from sales of lots acquired as acreage in 1941 [sic]. Claimants contend that such change was error and that the said lots were capital assets within the meaning of Sec. 117 of Internal Revenue Code.
(b) On October 21,1954, the plaintiffs filed an amendment to their claim for refund, the amendment reading as follows:
This is not an original claim but an amendment of a claim filed on May 21, 1954, in the amount of $1,811.19. The purpose of this amendment is to state an additional ground. The additional ground is that the assessment was barred by the Statute of Limitations. The return was filed on or before March 15, 1950. The assessment of the said amount of $1,811.19 was made on April 22, 1954.
(c) No action has been taken by the Commissioner of Internal Revenue, or by the Director of Internal Revenue at Los Angeles, or by the defendant on the plaintiffs’ claim, or on the amendment, or on the claim as amended.
46. Irrespective of whether the profits from the sale of lots in Tract 14471 during 1949 constituted long-term capital gains or ordinary income, the facts in the record are insufficient to permit an independent determination to be made respecting the proper amount of the plaintiffs’ income tax for 1949.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are entitled to recover, and it is therefore adjudged and ordered that they recover of and from the United States the sum of one thousand eight hundred eleven dollars and nineteen cents ($1,811.19), together with interest thereon as provided by law.